1

2

3

4

5

6

7

8          UNITED STATES  DISTRICT COURT

9            Northern District of California

10              San Francisco Division

11  BENJAMIN SANGRAAL and CATHERINE          No. C 11-04884 LB
    JONES,
12                                           **ORDER GRANTING  DEFENDANTS'**
                   Plaintiffs,               **MOTION FOR SUMMARY**
13        v.                                 **JUDGMENT**

14  CITY AND COUNTY OF SAN
    FRANCISCO, MARIA ELENA MARTINEZ,
15  BRANDI WOOLERY, SUSAN TAIT,
    BARBARA HIGGINS, DAN PHILLIPS,
16  RUDY PENA, CARMEN VILLEGAS-
    GRANT, JUDITH TINKLENBURG, and
17  MYRNA GOMEZ,

18                 Defendants.
    _____/
19

20                    **INTRODUCTION**

21      Plaintiff Catherine Jones sued county social workers and the City and County of San Francisco

22  ("CCSF"), alleging that they violated her constitutional rights when they took her new-born baby

23  Cora into protective custody based on circumstances about the baby's father (and former plaintiff)

24  Benjamin Sangraal that they thought risked imminent harm to the baby.  *See* Complaint, ECF No. 1.[1]

25  The remaining Defendants in this case – the CCSF and social workers Maria Elena Martinez, Susan

26  Tait, Barbara Higgins, and Dan Phillips – move for summary judgment.  *See* Defs.' Mot. for Summ.

27  _____

28      [1]  Citations generally are to the Electronic Case File ("ECF") with pin cites to the
    electronically-generated page numbers at the top of the document.

UNITED STATES DISTRICT COURT
For the Northern District of California

1   Judgment, ECF No. 37.  The court held a hearing on June 6, 2013, and **GRANTS** Defendants'

2   motion for summary judgment.

3                                    **STATEMENT**

4   **I.  BACKGROUND FACTS**[2]

5       Jones's claims arise out of three incidents:  (1) the two-day stay in the hospital after the baby's

6   birth pursuant to a "Safety Plan," which she and Sangraal signed after Martinez told them that she

7   would remove the baby from their custody unless they signed the plan and agreed not to take the

8   baby home from the hospital until after a Team Decision-Making meeting that took place two days

9   later; (2) the ultimate temporary removal of the baby from Jones's custody; and (3) the provision of

10  medical care to the baby without parental consent while the baby was in foster care.

11      **A.  Jones and Sangraal's Relationship and Jones's Pregnancy**

12      Plaintiff Catherine Jones and former Plaintiff Benjamin Sangraal met while they were in college.

13  Jones Decl., ECF No. 55, ¶ 2.  After Jones became pregnant in February 2010, Jones

14   and Sangraal read about pregnancy and childbirth and discussed various delivery and medical

15  treatment options.  Joint Statement of Undisputed Fact ("JSUF") 72; Jones Decl. ¶¶ 3-7.

16      Jones sought prenatal care from Judith Tinkelenberg,[3] a midwife affiliated with Sage Femme in

17  San Francisco.  Jones Decl. ¶¶ 6-7; Jones Dep. ¶ 6.  As part of Jones's prenatal care, she watched a

18  birthing video in which it appeared that "more persons than necessary had their hands in the crotch

19  of pregnant mothers."  Jones Decl. ¶ 7.  Jones "made known" that she did not want numerous people

20  in the delivery room when she was giving birth and that she wanted the minimum number of people

21  necessary "sticking their hands in [her] vagina during labor and delivery . . . and preferably only one

22  single doctor or nurse."  Jones Decl. ¶ 6.

23

24   _____

25       [2]  The court summarizes only the various facts (both undisputed and disputed) that the court
    deems necessary for purposes of this order.  In addition, Defendants ask the court to take judicial
26  notice of Juvenile Court filings.  *See* ECF No. 46.  Jones does not object and the court grants the
    request.
27

28       [3]  The spelling of "Tinkelenberg" is from the deposition transcript, not the case caption.  *See*
    Tinkelenberg Dep., ECF No. 54-3; Opp'n at 8.

UNITED STATES DISTRICT COURT
For the Northern District of California

Jones planned to have a "natural home-birth type experience at Sage Femme."[4]  Jones Decl. ¶ 9.  Jones's pregnancy ran longer than usual, however, and Tinkelenberg informed her that it was necessary for her to have her baby in a regular hospital.  JSUF 74; Jones Decl. ¶ 9.

Upon admission to the hospital, Jones asked if Sangraal could perform the vaginal examinations, in keeping with her desire for fewer unfamiliar persons touching her privates, because she "wanted him intimately involved in the birth of our daughter."  JSUF 75.  Jones also advised hospital staff that she wanted a minimal number of vaginal examinations and only when necessary.  JSUF 76.

Jones's and Sangraal's child, Cora Sangraal, was born on November 10, 2010 at San Francisco General Hospital.  JSUF 1.

**A. Social Worker Carthagena Calls Family and Children Services Emergency Hotline**

Hours after the birth, SFGH medical social worker Elizabeth Carthagena called the Children's Emergency Services ("CES") hotline of the Family and Children Services Division, San Francisco Human Services Agency ("FCS").  JSUF 2.  Carthagena reported the following (and attributed it to SFGH personnel):

(1) Sangraal and Jones refused to allow medical personnel to perform routine newborn care and examination of Cora, or even to touch her, JSUF 3;

(2) Sangraal behaved in a controlling manner toward Jones and claimed to own her, JSUF 4;

(3) Sangraal would not let hospital staff touch Jones or Cora, JSUF 5;

(4) Hospital personnel suspected Jones was a victim of domestic violence, JSUF 6;

(5) Sangraal was adamant that no one could talk to Jones about domestic violence, JSUF 7; and

(6) Sangraal insisted he was the only person who could perform pelvic exams on Jones during the labor process, JSUF 8.

Carthagena also told FCS that Jones's midwife had relayed to her in a telephone call that an alleged religious director of Sangraal and Jones's church (described as part of the Feri religion) alleged the following:

---

[4]  Jones's declaration references their plan to have an unassisted homebirth.  When she became overdue Sangraal wanted her "to *still* have an unassisted homebirth . . . ."  Jones Decl. ¶ 5 (emphasis added).

1  (7) Sangraal was "sexually grooming" a 13-year-old girl at a June 2010 summer camp, JSUF 9;

2  (8) Sangraal planned to have sexual contact with his children, JSUF 10; and

3  (9) Sangraal potentially had an open child protective services investigation ongoing in another

4  state, JSUF 11.

5  **B. Martinez's Investigation**

6  Maria Elena Martinez, an FCS social worker on the emergency response team, received the

7  Emergency Response Referral Information ("Emergency Referral") form generated from

8  information provided by Carthagena during her call to FCS, and she came to the hospital to

9  investigate on November 10, 2010.  JSUF 12-13.  Carthagena orally confirmed to Martinez what she

10  had reported to the CES hotline and told Martinez that Jones and Cora could be discharged as early

11  as later that evening  but that the parents refused to discuss discharge plans with hospital staff.

12  Carthagena Dep. 66:16-19, ECF No. 45-2 at 4; JSUF 14; Martinez Decl. ¶¶ 6-7, ECF No. 41.

13  Martinez also spoke with SFGH nurse Angel Dewitt-Hernandez, who stated that she called security

14  during the night of November 9, 2010 after Sangraal pushed a cart against the door in Jones's

15  hospital room while she was in labor, which caused something on the cart to fall to the ground and

16  break.[5]  JSUF 15.  Dewitt-Hernandez also told Martinez "that Sangraal sucked Jones's breasts and

17  performed oral genital stimulation on her while she was in labor in the presence of at least one other

18  person, whom Ms. Dewitt-Hernandez believed to be Sangraal's mother."[6]  Martinez Decl. ¶ 8.

19  When Martinez arrived at Jones's room, Sangraal had gone home to take care of the couple's

20  dog.  Jones Decl. ¶ 11, ECF No. 55.  Jones told Martinez that she did not want to speak with her

21  unless Sangraal was present or at least in the hospital.  *Id.*  Martinez took it as an "alarming sign"

22  that "Jones did not feel she was able to discuss Cora's best interests" with her.  Martinez Decl. ¶ 9,

23  ECF No. 41.  "This mentality made [Martinez] question [Jones's] ability to make independent

---

[5] Hospital staff interpreted this as showing anger, and Plaintiff describes the incident as frustration without intent to cause damage.  For this motion, all that matters is the undisputed fact that the incident occurred. Any assessment about the motive does not change the outcome.

[6] Jones disputes that any oral genital stimulation occurred, and the court does not presume that it did.  *See* Jones Decl. ¶ 12.

1    decisions in her child's best interests." *Id.*

2        At Martinez's request, Jones called Sangraal to ask him to return to the hospital.  JSUF 16.

3    Martinez again attempted to engage Jones in conversation, but Jones stated Martinez would have to

4    wait until Sangraal arrived.  JSUF 17.

5        While waiting for Sangraal to return to the hospital, Martinez spoke with Dr. Claire Herrick

6    about Sangraal and Jones.  JSUF 18; Martinez Decl. ¶ 11.  Dr. Herrick was the chief resident

7    obstetrician/gynecologist on duty at the time Jones gave birth and provided care to Jones during her

8    labor and delivery.  JSUF 19.  Dr. Herrick confirmed that Sangraal and Jones wanted minimal

9    medical personnel contact with Jones while she was in labor.  Martinez Decl. ¶ 11.  Dr. Herrick also

10   confirmed that Sangraal had displayed controlling behaviors and that the couple had refused to

11   discuss domestic violence with her.[7]  *Id.*

12       Sangraal returned to the hospital approximately forty-five minutes after Martinez initially met

13   with Jones.  JSUF 20.  When Sangraal arrived, Martinez spoke with him outside the presence of

14   Jones.  JSUF 21.  Sangraal acknowledged to Martinez that he pushed the cart in Jones's room the

15   previous night and that a medical device on it fell off due to his action.  JSUF 22.  Sangraal told

16   Martinez that he pushed the cart because hospital staff did not comply with his and Jones's request

17   to keep the number of people walking in and out of Jones's room to a minimum.  JSUF 23.  At the

18   conclusion of their conversation, Martinez told Sangraal that Jones refused to speak with her without

19   Sangraal's approval.  JSUF 24.  Sangraal asked Martinez to wait outside while he went into Jones's

20   hospital room to speak with her privately.  JSUF 25.

21       While waiting, Martinez called the couple's former midwife, Judith Tinkelenberg, who had

22   transferred the care of Jones to SFGH when Jones became overdue.  JSUF 26.  According to

23   Martinez, Tinkelenberg said that she feared Sangraal and Jones would flee with Cora if faced with a

24   court custody issue.  Martinez Decl. ¶ 14.  Martinez called her supervisor, Carmen Villegas-Grant,

25   to convey what she had learned.  JSUF 27.

26       After Sangraal emerged from Jones's room, he gave Martinez permission to speak with Jones

27

28       [7]  The court considers this hearsay information, not for its truth, but for what Martinez was
     told.

1   privately.  JSUF 28.  Martinez spoke with Jones for approximately twenty minutes.  JSUF 29.

2   During that conversation, Jones denied any domestic violence and stated that the allegations about

3   Sangraal's behavior with the 13-year-old girl were all lies.  JSUF 30-31.

4   **C.  The Safety Plan**

5   After her private meeting with Jones, Martinez discussed a Structured Decision-Making Safety

6   Plan with Jones and Sangraal.  JSUF 32; *see* Martinez Decl. Ex. B, ECF No. 41-3 at 2 (copy of

7   signed Safety Plan).  The Safety Plan was an agreement that Jones and Sangraal signed that provided

8   that "Baby girl & mother will remain admitted at SFGH until 11/12/10 (after 48 hours of baby

9   delivery)."  ECF No. 41-3 at 2.  Under the Safety Plan, there would be a TDM meeting on

10  November 12, 2010 but "Parents cannot take baby girl out of the hospital before 11/12/10.  Hospital

11  staff will immediately call police & put a hold on the baby."  *Id.*  Jones and Sangraal signed the

12  Safety Plan in Martinez's presence after a discussion of its contents.

13  **D.  The Team Decision-Making Meeting & the Decision to Place Cora in Foster Care**

14  A team decision-making meeting ("TDM") was held on November 12, 2010.  JSUF 34.  FCS

15  staff participants included Dan Phillips, Barbara Higgins, and Lesha Taylor.  *Id.*  Other participants

16  included Sangraal, Jones, Judith Tinkelenberg, and five friends or contacts invited by Sangraal and

17  Jones.  JSUF 35.  Social worker Susan Tait, who had received training in the exigent circumstances

18  standard, supervised the entire TDM unit.  JSUF 36.

19  Sangraal (age 25 at the time) spoke at the TDM and admitted he kissed a 13-year-old girl on the

20  mouth during a camp the previous summer when she was a camper and Sangraal was an adult

21  mentor.  JSUF 37.  Sangraal described the kiss as "a peck on the lips" as camp was ending and

22  campers were saying their goodbyes.  *Id.*  Sangraal acknowledged at the TDM that he spoke at the

23  camp with the 13-year-old girl about her "first blood," which he explained meant her first

24  menstruation.  JSUF 38.  Sangraal further acknowledged at the TDM that after the conclusion of the

25  camp, he engaged in text or other communications with the girl.  JSUF 39.  They communicated

26  about the girl's period and about possibly traveling together to, or meeting at, a summer solstice

27  event at Ocean Beach to be held in the summer of 2010 shortly after the end of the camp session.

28  JSUF 40.  Sangraal also mentioned that participants at this event run naked on the beach.  JSUF 41.

UNITED STATES DISTRICT COURT
For the Northern District of California

Finally, Sangraal suggested that his religion encouraged, even celebrated, an open attitude toward sex.  JSUF 51.  Jones did not contradict any of Sangraal's statements or decisions recounted during the TDM.  JSUF 44.

Three of Jones's and Sangraal's co-religionists who attended the TDM all claimed that nothing in their tradition prevented a woman from receiving medical care from a doctor and that nothing in their tradition prevented a newborn from receiving immunizations or any other kind of exam by a medical professional.  JSUF 49-50.  Sangraal's co-religionist Aline O'Brien thinks she stated at the TDM that no pagan tradition condoned sex between minors and adults.  JSUF 52.

A number of additional concerns were discussed at the TDM.  First, there was discussion about the allegations that Sangraal had confessed to a third party a desire to have sexual relations with his children.  JSUF 42.  This claim was reported by the third party to Tinkelenberg, who reported it to Carthagena, who called it into CPS.  *Id.*  Second was DeWitt-Hernandez's report to Martinez that another employee of SFGH had reported witnessing Sangraal orally stimulating Jones's vagina during the labor process.  JSUF 43.  Third, on at least one occasion, fetal stress test monitors were removed from Jones's belly before the hospital nurse had completed her evaluation of whether the fetus was thriving.  JSUF  45.  Tait also was aware that Carthagena had informed FCS that Sangraal might have an open child protective services case pending in another state, but the actual existence, nature and circumstances were unknown.  JSUF 48.

Tait later observed that Cora had urine on her body because she wet herself during the four-hour meeting, and neither parent cleaned or changed her.  JSUF 46.  Tait did not know at what point Cora had wet herself.  *Id.*  Tait concluded that given the serious nature of the allegations about Sangraal's sexual proclivities, Cora was not safe in his custody without further investigation, which would be impossible were the couple to flee with the newborn.  JSUF 47.

When asked whether Jones had any family members, such as Jones's mother, who could take Cora, Sangraal opposed custody with Jones's parents, because he said the parents had done "horrific" things to Jones.  JSUF 53.  Jones did not deny Tinkelenberg's assertion that she had been sexually abused.  JSUF 54.  Sangraal stated his family could not care for Cora.  JSUF 55.  After determining that no grandparents were appropriate caretakers, the couple's friends at the TDM were

asked whether they would be willing to assume the care of Cora, and no one volunteered.  JSUF 56.
Jones and Sangraal "did not suggest any other placement with someone other than them."  JSUF 57.
After the TDM, the social workers took Cora into state custody.  Those participating in the decision
on 11/12/10 to remove Cora at the TDM were Phillips, Higgins, Tait, and Taylor.  JSUF 84.  Cora
was given a vitamin K injection, infant formula, and a hearing test shortly after CPS took custody of
her away from her parents.  JSUF 86.

**E. Juvenile Court Proceedings**

On November 16, 2010, Martinez submitted a detention report summarizing her investigation to
the San Francisco County Superior Court, Juvenile Division.  JSUF 58.  On November 17, 2010, the
Juvenile Court conducted an initial detention hearing under California Welfare & Institutions Code
section 319 and issued an order that Cora remain in foster care pending an evidentiary detention
hearing that began on November 22, 2010.  JSUF 59.  At the end of the November 17, 2010 hearing,
the Juvenile Court found that, based solely on the report submitted by Martinez, "[a] prima face case
has been made that [Cora] comes within section 300 [of] W&I [Cal. Welfare & Institutions] Code
. . . . There is a substantial danger to the physical health of the child or the child is suffering severe
emotional damage, and there are no other reasonable means by which the child's physical or
emotional health may be protected without removing the child from the parents' . . . custody and
continuance in the home is contrary to the child's welfare."  JSUF 60-61.  In addition, the Juvenile
Court noted that "[r]easonable efforts have been made to prevent the need for removal from the
home, based upon the detention/social report dated/filed 11/16/10 [prepared by Maria-Elena
Martinez]."  JSUF 62.  The Juvenile Court ordered Cora detained, and vested temporary placement
and care with the San Francisco Department of Human Services pending further court order, and
approved placement in foster as "necessary and appropriate."  JSUF 63.

On November 22, 23, and 30 of 2010, a judge in the San Francisco Superior Court, Juvenile
Division, conducted an evidentiary hearing.  JSUF 64.  Martinez and Tait testified in this hearing.
JSUF 65.  Martinez did not have any new information that conflicted with what she had previously
learned about Jones and Sangraal at the time she testified.  JSUF 66.  Tait did not have any new
information that conflicted with what she had previously learned about Jones and Sangraal at the

UNITED STATES DISTRICT COURT
For the Northern District of California

1   time she testified.  JSUF 67.  At the end of the hearing, the Juvenile Court returned custody of Cora

2   to Jones under the condition that Sangraal be restricted from access to the infant through a

3   restraining order.  JSUF 68.  The Juvenile Court imposed a six-month restraining order that

4   prohibited Sangraal from all contact with Cora except for up to six hours of visitations per week

5   supervised by FCS.  JSUF 69.  Cora remained in the care of a foster mother from November 16,

6   2010, when she was discharged from SFGH, until December 1, 2010, when she was returned to the

7   care of her mother after the restraining order took effect.  JSUF 71.[8]

8   **II. PROCEDURAL HISTORY**

9       Jones and Sangraal filed this suit on October 3, 2011, alleging claims against the CCSF, social

10  workers Maria Elena Martinez, Brandi Woolery, Susan Tait, Barbara Higgins, Dan Phillips, Rudy

11  Pena, Carmen Villegas-Grant, and Myrna Gomez and Jones's former midwife Judith Tinklenburg.[9]

12  Compl., ECF No. 1, ¶¶ 8-22.  On March 28, 2013, Defendants filed the pending motion for summary

13  judgment.  ECF No. 37.

14      The parties stipulated to dismissal of some defendants and claims.  First, Benjamin Sangraal

15  dismissed all claims against all Defendants with prejudice.  *See* ECF No. 28.  Second, Jones

16  dismissed all claims against Defendants Pena, Grant, Woolery, and Gomez with prejudice.  *See* ECF

17  No. 28 (Pena); ECF No. 35 (Grant and Woolery); ECF No. 65 (Gomez).  In addition, the parties

18  stipulated to dismiss with prejudice Plaintiff's tenth claim for intentional infliction of emotional

19  distress.  ECF No. 36.  Jones also stipulated that she would waive any claim "that she suffers

20  ongoing emotional distress associated with the temporary removal of her child from her care and

21  custody by defendants, and shall limit her claim for emotional distress to that suffered during the

22  period from the inception of involvement with plaintiff by defendant [CCSF] and its employee

23  defendant social workers through the point at which the plaintiff's child was returned to her."  *Id.* at

24

25

26      [8]  On December 4, 2010, Cora was found dead in her crib and apparently died from sudden
     infant death syndrome.  Martinez Decl. ¶ 27.  Her death is not part of this lawsuit.

27      [9]  Defendant Judith Tinklenburg was served on October 15, 2011, *see* Proof of Service, ECF
28   No. 6.  She has not appeared in the case, and Plaintiff never filed for entry of default.  *See generally*
     Docket.  The parties stipulated that she should be severed from the case.  *See* ECF No. 68.

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

**UNITED STATES DISTRICT COURT**
For the Northern District of California

2.  In Jones's opposition to the summary judgment motion, she waived her eighth (First Amendment) and ninth claims (Cal. Civ. Code § 52.1).  *See* Opp'n, ECF No. 53 at 6 n.1.  In their summary judgment reply brief, ECF No. 58, Defendants argued that Jones had failed to oppose their motion to summary judgment on the fourth, fifth, and sixth claims, all of which allege 4th Amendment violations.  *See* Reply, ECF No. 58 at 5 n.2.  Subsequently, the parties stipulated to dismissal of the fifth and sixth claims.  *See* ECF No. 65.   This chart shows the claims that remain:

| # | Claim | Defendants |
|---|-------|-----------|
| 1 | 14th Amendment - Interference with Familial Relations | Martinez, Tait, Higgins, Phillips, ~~Woolery. Pena~~ |
| 2 | 14th Amendment - Removal (In Alternative) | Martinez, Tait, Higgins, Phillips, ~~Woolery, Pena~~ |
| 3 | 14th Amendment - Continued Detention | Martinez, Tait, Higgins, Phillips, ~~Woolery, Pena, Grant~~ |
| 4 | 4th Amendment - Unlawful Seizure | Martinez, Tait, Phillips, ~~Pena~~ |
| 5 | ~~4th Amendment - Unlawful Entry to Home~~ | ~~Martinez, Tait, Phillips, Pena, Gomez~~ |
| 6 | ~~4th Amendment - Unlawful Search~~ | ~~Martinez, Tait, Phillips, Pena, Gomez~~ |
| 7 | 14th Amendment - "Inoculations and Medical Treatment w/o Parents" | Martinez, Tait, Higgins, Phillips, ~~Woolery, Pena~~ |
| 8 | ~~1st Amendment - Rights of Association~~ | ~~Martinez~~ |
| 9 | ~~State Constitutional Rights - Cal. Civil Code § 52.1~~ | ~~Martinez, Tait, Higgins, Phillips, Pena~~ |
| 10 | ~~Intentional Infliction of Emotional Distress~~ | ~~Martinez, Woolery, Tait, Higgins, Phillips, Pena, Grant~~ |
| 11 | 1st Amendment - State & Federal Rights of Medical Privacy | Tinkelenburg (severed) |
| 12 | *Monell* Liability | City and County of San Francisco |
| Misc. | Sangraal's Dismissed Claims | All Claims Against All Defendants |

## ANALYSIS

## I. SUMMARY JUDGMENT STANDARD

A motion for summary judgment should be granted if there is no genuine issue of material fact

UNITED STATES DISTRICT COURT
For the Northern District of California

1    and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Anderson v.*

2    *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Material facts are those that may affect the

3    outcome of the case.  *Anderson*, 477 U.S. at 248.  A dispute about a material fact is genuine if there

4    is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  *Id.* at 248-

5    49.

6         The party moving for summary judgment has the initial burden of informing the court of the

7    basis for the motion and identifying those portions of the pleadings depositions, answers to

8    interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material

9    fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  To meet its burden, "the moving party

10   must either produce evidence negating an essential element of the nonmoving party's claim or

11   defense or show that the nonmoving party does not have enough evidence of an essential element to

12   carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz*

13   *Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see Devereaux v. Abbey*, 263 F.3d 1070, 1076

14   (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need

15   only point out 'that there is an absence of evidence to support the nonmoving party's case.'")

16   (quoting *Celotex Corp.*, 477 U.S. at 325).

17        If the moving party meets its initial burden, the burden shifts to the non-moving party, which

18   must go beyond the pleadings and submit admissible evidence supporting its claims or defenses and

19   showing a genuine issue for trial.  *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Nissan Fire*,

20   210 F.3d at 1103; *Devereaux*, 263 F.3d at 1076.  If the non-moving party does not produce evidence

21   to show a genuine issue of material fact, the moving party is entitled to summary judgment.  *See*

22   *Celotex*, 477 U.S. at 323.

23        In ruling on a motion for summary judgment, inferences drawn from the underlying facts are

24   viewed in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith*

25   *Radio Corp.*, 475 U.S. 574, 587 (1986).

26   **II.  SECTION 1983 CLAIMS BASED ON DETENTION AND REMOVAL**

27        Jones's claims against the individual defendants arise under 42 U.S.C. § 1983.  To prevail on a

28   Section 1983 claim, a plaintiff must demonstrate that state action deprived her of federally-secured

constitutional rights.  *See Leer v. Murphy*, 844 F.2d 628, 632-33 (9th Cir. 1988) (citations omitted).  The parties do not dispute that the defendants acted under color of state law.  The issue is whether their actions violated either Jones's due process rights to familial association or the Fourth Amendment.

**A.  Interference with Familial Relations (Claims 1 through 3 and 7)**

"Parents and children have a well-elaborated constitutional right to live together without governmental interference." *Wallis v. Spencer*, 202 F.3d 1126, 1137 (9th Cir. 1999) (collecting cases).  That right is a liberty interest protected by the Fourteenth Amendment. *Id.*; *see Troxel v. Granville*, 530 U.S. 57, 65 (2000).  Thus, parents have the right not to "be separated from their children without due process of law, except in emergencies." *Mabe v. San Bernardino County*, 237 F.3d 1101, 1107 (9th Cir. 2001).  "Under certain circumstances, these rights must bow to other countervailing interests and rights, such as the basic independent life and liberty rights of the child and of the State acting as *parens patriae*; and on occasion, this accommodation may occur without a pre-deprivation hearing." *Mueller v. Auker*, 700 F.3d 1180, 1186 (9th Cir. 2012) (citing *Thomason v. SCAN Volunteer Servs., Inc.*, 85 F.3d 1365, 1371 (8th Cir. 1996) ("[T]he liberty interest in familial relations is limited by the compelling government interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves.")).

A government official may intrude on a parent's custody of her child without obtaining a warrant if the official has information "at the time of the seizure that establishes 'reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury.'" *Mabe*, 237 F.3d at 1106 (quoting *Wallis*, 202 F.3d at 1138).  The court uses an objective standard to determine whether information provided an official with reasonable cause to believe exigent circumstances exist. *See Wallis*, 202 F.3d at 1139 n.9.

No fixed formula determines exigency, and courts consider the totality of the circumstances. *See Doe v. Kearny*, 329 F.3d 1286, 1295 (11th Cir. 2003).  Relevant factors that can weigh in favor of exigency include the following: (1) the parents' credibility (*see Ram v. Rubin*, 118 F.3d 1306, 1309

1   (9th Cir. 1997) and *Gomes v. Wood*, 451 F.3d 1122, 1125 (10th Cir. 2006)); and (2) the age of the

2   child (*see Dietz v. Damas*, 932 F. Supp. 431, 447 (E.D.N.Y. 1996) (noting that while a child's report

3   of abuse or neglect can serve as compelling evidence in the exigency analysis, "babies [are]

4   incapable of testifying")).

5                  *1.  The Safety Plan Due Process Claim (Claim 1)*

6       Jones alleges that Martinez, Tait, Higgins, and Phillips violated her constitutional right to

7   familial association when they required Jones and Sangraal to sign the Safety Plan and comply with

8   its terms, which barred them from leaving the hospital with Cora for two days.  Compl. ¶¶ 200-03.

9   Defendants argue that Tait, Higgins, and Phillips had nothing to do with the safety plan and that the

10  claim against Martinez fails because of the following: (1) Jones and Cora were not separated so there

11  was no disruption of the mother-child relationship, (2) Jones consented to the Safety Plan,  and (3)

12  any initial detention was warranted by exigent circumstances.  *Id.* at 20-21.

13      As to the involvement of Tait, Higgins, and Phillips, no evidence suggests any involvement by

14  them until the TDM meeting on November 12, 2010.  *See* Motion at 21.  Jones did not suggest

15  otherwise in her opposition, and she agreed this was true at the June 20, 2013 hearing.  *See* Opp'n at

16  15.  The court grants summary judgment as to Defendants Tait, Higgins, and Phillips.

17      As to Martinez, Defendants have three arguments: there was no disruption of familial relations,

18  the parents consented, and exigent circumstances justified what happened.

19      As to the disruption of familial relations, Defendants' argument is that the Safety Plan did not

20  deny Jones access to Cora, Jones's "family unity was not disrupted . . . [and] no substantive due

21  process interest was implicated," and at best the claim is a Fourth Amendment claim for wrongful

22  detention.  Mot. at 21-22.

23      The undersigned is not persuaded that separation of parent and child is a necessary element of an

24  interference with familial relations claim.  No case cited by the Defendants says that.  Defendants

25  rely on *Mabe*, 237 F.3d at 1107.  *See* Reply at 7.  The *Mabe* court said only that "[t]he Fourteenth

26  Amendment guarantees that parents will not be separated from their children without due process of

27  law except in emergencies."  This was an articulation of the legal standard in a case that challenged

28  separation of parent and child (as opposed to a holding that separation is a prerequisite to a claim).

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1    *See* 237 F.3d at 1107.  The Defendants also cite *Doe v. Heck*, 327 F.3d 492, 519 (7th Cir. 2003), *see*

2    Mot. at 21-22, but that case said only that "if a plaintiff's sole purpose in bringing a familial relations

3    claim is to recover damages for a physical seizure, then that claim is more appropriately analyzed

4    under the Fourth Amendment."  *Id.*  The court also explained that,

> [o]n the other hand, if . . . a familial relations claim specifically alleges that the government's
> physical seizure coincided with other conduct amounting to an interference with the parent-
> child relationship (e.g., custodial interview of child by government officials without the
> consent of his parents and without reasonable suspicion that parents were abusing the child
> or that the child was in imminent danger of abuse), that allegation of harm constitutes a
> separate and distinct violation of a separate fundamental constitutional right and both claims
> may therefore be maintained.

9    *Id.* (internal citation omitted) (Fourth and Fourteenth Amendment claims cognizable for child who

10   was seized).

11       The next issue is whether the parents' voluntary consent to the conditions in the safety plan

12   eliminates any claim.  Defendants say it does, but Jones alleges that her consent was involuntary in

13   that Martinez coerced her into signing the Safety Plan by threatening to take away her child.

14       No Ninth Circuit case addresses whether safety plans such as this one are inherently coercive.  In

15   *Dupuy v. Samuels,* the Seventh Circuit rejected the parents' argument that "safety plans are

16   inherently coercive when agencies force parents to sign the plan or face the threat of formal removal

17   proceedings" because the safety plan is still voluntary.  465 F.3d 757, 759-63 (7th Cir. 2006); *see*

18   *also Teets v. Cuyahoga County, Ohio*, 460 Fed. App'x 498, 503 (6th Cir. 2012) (granting summary

19   judgment against parents' procedural due process claim because feeling coerced is insufficient to

20   establish that a safety plan is involuntary).  Judge Posner analyzed the constitutionality of an Illinois

21   child-welfare agency's practice of offering "safety plans" to parents in lieu of removing the child.

22   *Dupuy*, 465 F.3d at 760.  Though the restrictions imposed under a safety plan may be less onerous

23   than removal, "they may be invasive enough to count as deprivations of liberty . . . ."  *Id.*

24   "Critically, however, the decision to agree to a safety plan is optional with the parents."  *Id.* at 761.

25   "The state does not force a safety plan on the parents; it merely offers it."  *Id.*  "Because the safety

26   plan is voluntary, no hearing of any kind is necessary; hearings are required for deprivations ordered

27   over objection, not for steps authorized by consent."  *Id.* at 761-62; *see also Hernandez ex rel.*

28   *Hernandez v. Foster*, 657 F.3d 463, 482 (7th Cir. 2011) (quoting the same passage for the

UNITED STATES DISTRICT COURT
For the Northern District of California

1   proposition cited).   Analogizing safety plans to settlement agreements, the court held that "[i]t is not

2   a forbidden means of 'coercing' a settlement to threaten merely to enforce one's legal rights. . . .

3   Coercion is objectionable – and when objectionable is more aptly described as duress or extortion –

4   when illegal means are used to obtain a benefit." *Dupuy*, 465 F.3d at 762 (finding no evidence of

5   coercion). *Id.*

6      The court finds this analysis persuasive.   The issue then is whether the uncontroverted evidence

7   here shows voluntary consent.

8      One example of coercion is when a state agency lacks legal authority to remove the child but

9   coerces parents into agreeing to a safety plan by threatening to remove the child anyway. *See id.* at

10  763.   For example, in *Croft v. Westmoreland County Children and Youth Services*, the Third Circuit

11  reversed the district court's summary judgment for the defendant because the social worker lacked

12  objectively reasonable grounds to believe the child had been sexually abused or was in imminent

13  danger of sexual abuse. *See* 103 F.3d 1123, 1127 (3rd Cir. 1997).   There, acting on an anonymous

14  abuse allegation, the social worker told the parents that she would remove the child from the home

15  unless the father consented to leave the home and have no contact with his daughter while a full

16  investigation was pending. *Id.* at 1125-25.   The only evidence supporting the social worker's

17  ultimatum was the "six-fold hearsay report by an anonymous informant"[10] and inconsequential

18  inconsistencies in the parents' statements. *Id.* at 1125-27.   The social worker conceded that after

19  interviewing the parents, she "had no opinion one way or the other whether sexual abuse had

20  occurred," and lacked information to make an abuse determination. *Id.*   Accordingly, the court of

21  appeals reversed the district court and suggested that two members of the panel would have entered

22  summary judgment for the parents had they filed a cross-motion. *Id.* at 1127.

23     Similarly, in *Hernandez*, the parents put in evidence that the social worker threatened the parents

24  "that they could not even see [their child] if they did not sign the safety plan *after* suspicions of

25  abuse had dissipated" and after the child had been taken from their custody.   657 F.3d at 483-84.   It

26

27  ───────────────

28     [10]   The anonymous tipster reported that the mother told a friend about the sexual abuse.   The tipster told a child abuse hotline representative.   The message then was passed through two county children's bureau social worker intermediaries to the investigating social worker.

1    was this threat "without even a reasonable suspicion of abuse to get them to agree to the safety plan"

2    that violated the parents' constitutional rights.  *Id.* at 484.

3        The disagreement here boils down to whether Martinez really had "reasonable cause to believe

4    that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is

5    reasonably necessary to avert that specific injury."  *See Wallis v. Spencer*, 202 F.3d at 1138.  If she

6    did, then it was not a "fake threat," but if she did not, then she did not have the legal right to

7    mandate removal if Jones refused.  The parties also disagree about the import of some of the

8    evidence.  For example, Jones disputes the accuracy of parts of Carthagena's report.  *See* Opp'n at 9-

9    11.  She argues that Sangraal was not behaving in a controlling manner toward her, she allowed at

10   least Dr. Herrick to perform a pelvic examination on her, the "cart incident" was overblown, and

11   they denied any domestic violence.  Opp'n at 9-14.  Jones also challenges the motives of the alleged

12   religious director of Sangraal and Jones's church for telling Tinkelenberg that Sangraal was

13   "sexually grooming" a 13-year-old girl, planned on having sexual contact with his children, and may

14   have an open child protective services investigation ongoing in another state.  *Id.*

15       Regardless of the weight or significance one gives the facts, it is undisputed that Carthagena, a

16   professional social worker, reported this information to Martinez through the Children's Emergency

17   Services hotline and confirmed the information in person.  It also is undisputed that Tinkelenberg

18   told Martinez she was concerned that Jones and Sangraal might flee with Cora if faced with a court

19   proceeding concerning custody of the baby.  This is strong evidence of reasonable cause of

20   imminent harm, and the Safety Plan was narrowly tailored to prevent that harm.

21       It also is true that Carthagena reported second-hand information reported to her by Tinkelenberg

22   and hospital personnel.  But even if there were some factual debate about whether Martinez had

23   reasonable cause of exigent circumstances at the time of the safety plan, the court would grant

24   Martinez summary judgment based on qualified immunity.

25       "The doctrine of qualified immunity protects government officials 'from liability for civil

26   damages insofar as their conduct does not violate clearly established statutory or constitutional rights

27   of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)

28   (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "The protection of qualified immunity

UNITED STATES DISTRICT COURT
For the Northern District of California

1  applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact,

2  or a mistake based on mixed questions of law and fact.'" *Id*. (quoting *Groh v. Ramirez*, 540 U.S.

3  551, 567 (2004) (Kennedy, J., dissenting)).   The qualified immunity inquiry has two steps.  *See*

4  *Saucier v. Katz*, 533 U.S. 194, 232 (2001).   The first step is whether the plaintiffs' facts make out

5  violation of a constitutional right.   *Id*.   If so, the second step is "whether the right at issue was

6  'clearly established' at the time of defendant's alleged misconduct."  *Pearson*, 555 U.S. at 232.

7  While the order in *Saucier* "is often beneficial," the court has discretion about the order in which it

8  addresses the two steps.  *Id.* at 236.

9      A right is clearly established if "it would be clear to a reasonable officer that his conduct was

10  unlawful in the situation he confronted."  *Saucier*, 533 U.S. at 202.  This inquiry "must be

11  undertaken in light of the specific context of the case, not as a broad general proposition."  *Id.* at

12  201.  "This is not to say that an official action is protected by qualified immunity unless the very

13  action in question has previously been held unlawful, but it is to say that in the light of pre-existing

14  law the unlawfulness must be apparent."  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  "The

15  plaintiff bears the burden of showing that the right at issue was clearly established under this second

16  prong."  *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002).

17      The issue here is whether it was clearly established that the 48-hour "hold" on Cora's discharge

18  interfered with Jones's familial relations, given the abuse allegations and the behavior Martinez

19  observed.  Jones fails to identify any authority showing that it was clearly established that Martinez

20  violated her constitutional rights.  Jones cites *Hernandez* and *DuPuy* for the proposition that

21  coercing parental consent to removal is unconstitutional absent legal authority to remove the child.

22  *See* Opp'n at 19.  But these out-of-circuit cases discuss removal – a greater intrusion – and they

23  involved less serious allegations.  Given the seriousness of the allegations presented and the limited

24  intrusion, Jones has not met her burden of showing that it would have been clear to a reasonable

25  social worker that Martinez's conduct was unlawful in the situation presented.  The court GRANTS

26  Defendants' motion for summary judgment.

27          ***2.  The Removal Due Process Claim (Claim 2)***

28      Jones alleges that Martinez, Tait, Higgins, and Phillips violated her due process right to familial

association by removing Cora after the TDM.  Compl. ¶¶ 204-07.  Defendants argue that exigent

circumstances justified removal and that in any event, they have qualified immunity.  Mot. at 22-24.

Jones disputes Defendants' version regarding many of the facts presented at the TDM and

characterizes it as a "railroad job."  *See* Opp'n at 14-15.  What is undisputed is that at the TDM,

Defendants were privy to allegations that (if taken as true) raised concerns about sexual abuse and

domestic violence by Sangraal and neglect by both parents.  Regarding the risk of sexual abuse by

Sangraal, the following was presented at the TDM:[11]

> (1)  Sangraal, age 25, admitted (a) kissing a 13-year-old camper on the lips at the end of summer camp (characterizing it as a peck on the lips), (b) discussing menstruation with her, and (c) subsequently communicating with her about possibly traveling to, or meeting at, the summer solstice event where participants run naked on the beach;

> (2)  Carthagena's report that Tinkelenberg told her that she was told by a third party that Sangraal confessed a desire to have sexual relations with his children; and

> (3)  an SFGH employee told DeWitt Hernandez, who told Martinez, that Sangraal was orally stimulating Jones's vagina during the labor process.

JSUF 37-43.  The social workers also had evidence that Jones and Sangraal refused to authorize

routine testing and screening procedures on Cora, terminated the antenatal fetal stress testing, and

limited medical access to Jones's body during labor.  *See* JSUF 45, 3-5.  In addition, Jones would

not speak with Martinez without discussing it first with Sangraal, and Sangraal had been angry and

reacted physically in the hospital with the cart incident.  JSUF 15, 22.

Jones disputes the weight that this evidence should be given.

For example, at the TDM, Sangraal explained that he only gave the 13-year-old girl a "peck" on

the lips as the campers were all saying goodbye, he did not know the girl was 13, and the girl texted

him.  Opp'n at 16-17.  With regard to the allegations about wanting to have sex with his own

children, Sangraal explained at the TDM that he had a falling out with the man making the

allegations.  *Id.* at 18.  Similarly, Jones explains her refusal to authorize medical procedures on Cora

because those tests were not medically necessary.  *Id.* at 12.  Jones also points to purported

---

[11]  The court does not consider the information from the Joint CMC Statement filed in this matter that on November 9, 2012, Sangraal was due to be sentenced "on a recent judgment of conviction for possession or attempted possession of child pornography in the State of Illinois." Joint CMC Statement, ECF No. 24 at 2.

1   inconsistencies in the evidence from the social workers.  *See, e.g., id.* at 18.

2        Jones also argues that Defendants imposed an excessive restriction.  *Id.* at 26.  "[T]he degree of

3   the state interference [must be] justified by the alleged exigency."  *Wallis*, 202 F.3d at 1140.

4   Defendants explain that they "explored whether Cora could be placed with family or friends" but the

5   grandparents and friends were either unsuitable or unwilling.  Reply at 12; *see* Tait Decl., ECF No.

6   16.  They also point out that "Jones's behavior was itself a relevant factor in the removal

7   determination."  Reply at 13.

8        As in the previous section,  even assuming some factual debate about reasonable cause of

9   exigent circumstances, the court would grant Martinez summary judgment based on qualified

10  immunity.

11       Jones nonetheless argues that *Wallis* compels a different outcome.  *See* Opp'n at 21-22, 24, 26-

12  27.  *Wallis* is distinguishable.

13       In *Wallis*, also a removal case, the Ninth Circuit reversed a district court decision granting

14  summary judgment to the defendant police officers and social workers.  *See* 202 F.3d at 1140.  The

15  plaintiff / father's estranged sister, "a mental patient who had a long history of delusional disorders

16  . . . told her therapist a fantastic tale of Satanic witchcraft within her family and an impending child

17  sacrifice."  202 F.3d at 1131-34.  Her report – that the plaintiff was going to sacrifice his son to

18  Satan – was relayed through a series of social workers and police officers.  *Id.*  Acting on the

19  mistaken belief that there was a court order to take the children into custody, the police seized the

20  children in the middle of the night without conducting a significant investigation, subjected them to

21  anal and vaginal examinations at a hospital, and kept them from both parents for several months.  *Id.*

22  at 1140.  No allegations implicated the mother.  *Id.*  Under those circumstances, the Ninth Circuit

23  held that a reasonable jury could find that the officers lacked reasonable cause to remove the

24  children without a court order and also could find that the degree of the interference (in the form of

25  two-and-one-half months of detention and invasive medical exams) was not justified by the

26  exigency.  *Id.*

27       In contrast to *Wallis*, Defendants did not rely just on the fantastic allegations of a mental patient.

28  They had unverified allegations of sexual abuse that are more obviously plausible than wild claims

of ritual sacrifice.  There was corroboration.  Sangraal admitted kissing a 13-year-old girl on the lips at her summer camp and texting with her about traveling together to a religious event where participants run naked on the beach.  He reacted angrily with the cart when things did not go as he wanted them to at the hospital, and witnesses described him as exhibiting controlling behavior. *Wallis* does not establish that the facts here render the decision to remove Cora clearly unreasonable.

Nor does *Wallis* clearly establish that a lesser restriction was required in this case.  Unlike *Wallis*, Defendants did not remove a child from an established home based solely on allegations regarding one parent.  Instead, the evidence suggests that they thought Jones's behavior was a basis for removal, and they were concerned that Jones would not protect Cora from Sangraal.  *See* JSUF 44-46.  The Ninth Circuit has found that removing a child from a non-abusing mother was reasonably necessary "where the official reasonably believed that the mother was not protecting the child."  *Burke v. Cnty. of Alameda*, 586 F.3d 725 (9th Cir. 2009) (discussing *Mabe*, 237 F.3d at 1110).  Accordingly, on these facts, Jones has not shown that a reasonable social worker would have placed Cora with her subject to unspecified additional protections.  Because Defendants' actions were not clearly unlawful, the court GRANTS their motion for summary judgment on Jones's second claim.

### 3. Continued Detention Due Process Claim (Claim 3)

Jones alleges that Martinez, Tait, Higgins, and Phillips violated her due process rights to familial association by continuing to detain Cora by imposing the Safety Plan, removing her after the November 12 TDM and by continuing to keep her apart from Jones after the November 15, 2010 hearing.  Compl. ¶¶ 208-11; Opp'n at 27.[12]  The continued detention was based on the Safety Plan

---

[12]  The parties dispute whether the proper legal standard is "unwarranted interference" or "deliberate indifference," and the case law appears divided.  *See* Mot. at 24; Opp'n at 27; *compare Kulya v. City and County of San Francisco*, No. C 06-06539 JSW, 2008 WL 4415116, at *7 (N.D. Cal. Sept. 26, 2008) (a violation occurs when governmental conduct is "so offensive and intentional as to 'shock the conscience'") (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)), *with Crowe v. Cnty of San Diego*, 608 F.3d 406, 441 (9th Cir. 2010) (violation may be premised on "[u]nwarranted state interference").  The standard does not alter the outcome.  *See Mikich v. Cnty of San Francisco*, No. C-11-04629 DMR, 2013 WL 897207, at *14 (N.D. Cal. Mar. 8, 2013).

1    and the subsequent removal determination at the TDM.  Again, even if there are fact issues about

2    reasonable cause of imminent danger, qualified immunity shields Defendants.  It would not be

3    apparent in 2010 to reasonable social workers that Cora's removal from Jones's custody was clearly

4    unlawful in light of the facts known to Defendants.

5           Then, on November 17, 2013, the Juvenile Court ordered Cora detained after determining that

6    there was a substantial danger to her physical health, and that there were "no other reasonable means

7    by which [her] physical . . . health may be protected without removing [her] from her parents' . . .

8    physical custody[;] and continuance in the home is contrary to the child's welfare.  Order, ECF No.

9    46-1 at 2.  The court ordered Cora "detained . . . . Court approves the necessary and appropriate

10   placement in foster care."  *Id.*   The social workers' following a court order entitles them to absolute

11   immunity (an argument that Jones did not address in her opposition).  *See Tamas v. Dept. of Social*

12   *and Health Servs.*, 630 F.3d 833, 842 (9th Cir. 2010).   And again, nothing changes the court's

13   conclusion that the social workers in any event are entitled to qualified immunity because reasonable

14   social workers would not have known that they were violating a clearly-established constitutional

15   right.

16              ***4. Medical Treatment of Cora While In Foster Care (Claim 7)***

17          Cora was in foster care until December 1, when she was returned to her mother's care.  She

18   received "a vitamin K injection, infant formula, and a hearing test."  JSUF 86; Powell Decl. Ex. Q,

19   ECF No. 54-3 at 97 (medical records confirm HIV test, vitamin K injection, and hearing screen).

20          Defendants argue that the state has the right to provide routine, non-investigatory medical care to

21   children in its care.  Mot. at 25.  Jones responds that by the "the medical care was unlawful without

22   parental consent unless exigent circumstances were present."  Opp'n at 28.

23          When the state removes a child from parental custody, "as parens patriae, [it] may order medical

24   care for a child absent parental consent."  *Johnson v. Yolo Cnty. Dep't of Human Servs.*, No.

25   CIVS041523MCEGGHP, 2005 WL 3020056 (E.D. Cal. Nov. 10, 2005) *report and recommendation*

26   *adopted*, No. 204CV1523MCEGGHP, 2006 WL 572914 (E.D. Cal. Mar. 8, 2006) (citing *Prince v.*

27   *Massachusetts*, 321 U.S. 158, 166-67 (1944)); *cf. West v. Atkins*, 487 U.S., 42, 56 (1988) (stating, in

28   the context of prison medical care, that the State has a "constitutional duty to provide adequate

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1   medical treatment to those in its custody"); *cf. Wallis*, 202 F.3d at 1141 (children were taken into

2   state custody and subjected to invasive medical exams in order to investigate the abuse allegations;

3   holding that absent parental consent or notice and the opportunity to be heard, "physical

4   examinations of their child may not be undertaken *for investigative purposes* at the behest of state

5   officials").

6       If exigent circumstances justified removal, then there is no constitutional violation for the

7   CCSF's provision of medical care to an infant in its care.  Similarly, after the juvenile court's order

8   of removal, no constitutional violation is demonstrated.  Regardless, qualified immunity applies for

9   the reasons discussed previously.

10      **B. The 4th Amendment Claim (Claim 4)**

11      In her fourth claim, Jones alleges that Martinez, Tait, and Phillips violated her Fourth

12   Amendment right to be free from unreasonable search or seizure.  Compl. ¶¶ 212-214.  Jones alleges

13   that this claim "relates to the hospital detention under the 'Safety Plan,' which did not allow the

14   parents at any time to both leave the hospital with their child until the TDM set for November 15th

15   [*sic*], 2010."  *Id.* ¶ 213.

16      Defendants move for summary judgment on the grounds that no evidence suggests that Tait or

17   Phillips were involved with the Safety Plan and the Safety Plan was not a seizure.  Mot. at 25-26.

18   There is no evidence establishing that either was involved in the Safety Plan.  The Safety Plan did

19   not operate as a seizure.  In any event, Martinez is entitled to qualified immunity.  The court

20   GRANTS Defendants' motion for summary judgment on Jones's fourth claim.

21   **III.  MONELL LIABILITY (CLAIM 12)**

22      Jones's *Monell* claim is predicated on her contentions that County Emergency Response social

23   workers rarely, if ever, obtain warrants before removing from children from parental custody and

24   were inadequately trained on the warrant requirements.  *See* Opp'n at 29-32.  For example, Higgins

25   testified that she had worked in the ER since 2000, had removed upwards of 1000 children from

26   parental custody, never obtained a protective custody warrant to do so, and did not recall ever

27   receiving training on the use of custody warrants.  Powell Decl. Ex. H, ECF No. 54-3 at 15-22.

28   Phillips testified that before 2010, he had not received training on the use of warrants to remove

1  children from their parents.  Powell Decl. Ex. I, ECF No. 54-3 at 35-36.  Similarly, Martinez

2  removed a child from a family unit five to eight times a year but had never sought a warrant first.

3  Powell Decl. Ex. B, ECF No. 54-3 at 21-23; *see* Martinez Depo., ECF No. 54-1(received training on

4  when warrantless removal is appropriate; testified that risk of non-imminent harm required her to

5  seek protective custody warrant); JSUF 36 (Social worker Susan Tait, who had received training in

6  the exigent circumstances standard, supervised the entire TDM unit).

7      Jones's *Monell* claim for an unconstitutional custom fails.  While she shows prior removals of

8  children by ER social workers without a warrant, she does not demonstrate that these incidents were

9  unconstitutional.  A *Monell* claim, whether for a municipal policy or for failure to train, generally

10  cannot be premised on a single unconstitutional incident.  *See Trevino v. Gates*, 99 F.3d 911, 918

11  (9th Cir. 1996) ("liability for improper custom may not be predicated on isolated or sporadic

12  incidents"); *City of Canton v. Harris*, 489 U.S. 378, 390-391 (1989) ("That a particular officer may

13  be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's

14  shortcomings may have resulted from factors other than a faulty training program."); *Lee v. City of

15  Los Angeles*, 250 F.3d 668, 681 (9th Cir. 2001) (noting that the failure to train must result from a

16  conscious or deliberate choice to follow a course of action made from among various alternatives).

17  As another court in this district recently explained in *Mikich*, when granting summary judgment on a

18  nearly identical theory, "[t]hat social workers have never applied for warrants does not demonstrate

19  the existence of constitutional violations that would have necessitated disciplinary action."  2012

20  WL 897207, at *17.  Accordingly, the court GRANTS Defendants motion for summary judgment on

21  Jones's *Monell* claim.

## CONCLUSION

23      The court **GRANTS** Defendants' Motion for Summary Judgment on the remaining claims.  This

24  disposes of ECF No. 37.

25      **IT IS SO ORDERED.**

26  Dated: June 20, 2013

27  _____
    LAUREL BEELER
    United States Magistrate Judge

28